Filed 5/16/19; pub. order 6/14/19 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | C083913 |
| Plaintiff and Appellant, | (Super. Ct. No. 34201580002149CUWMGDS) |
| v. | |
| CALIFORNIA DEPARTMENT OF CONSERVATION, DIVISION OF OIL, GAS AND GEOTHERMAL RESOURCES et al., | |
| Defendants and Respondents. | |

The Center for Biological Diversity appeals from a judgment denying its petition for a writ of mandate challenging an environmental impact report (EIR) prepared by the California Department of Conservation, Division of Oil, Gas and Geothermal Resources (Department) pursuant to a law known as Senate Bill No. 4. (Stats. 2013, ch. 313, § 2, enacting Sen. Bill No. 4; hereafter, Senate Bill No. 4.) Senate Bill No. 4 added sections 3150 through 3161 to the Public Resources Code to address the need for additional information about the environmental effects of well stimulation treatments such as

1

hydraulic fracturing and acid well stimulation.  (Stats. 2013, ch. 313, §§ 1 & 2; see Sen. Floor Analysis of Sen. Bill No. 4, dated Sept. 12, 2013; Assem. Floor Analysis of Sen. Bill No. 4, dated Sept. 9, 2013.)[1]  As relevant here, Senate Bill No. 4 required the Department to prepare an EIR "pursuant to the California Environmental Quality Act ([Public Resources Code] Division 13 (commencing with Section 21000) [CEQA]), to provide the public with detailed information regarding any potential environmental impacts of well stimulation in the state."  (§ 3161, subd. (b)(3)(A).)

The Department prepared and certified an EIR.[2]  The Center filed a petition for writ of mandate and complaint for declaratory and injunctive relief, challenging the EIR under CEQA and Senate Bill No. 4.  The trial court sustained a demurrer to the Center's cause of action for violations of CEQA, and subsequently denied the petition for a writ of mandate.  We affirm.

## I.  BACKGROUND

Well stimulation treatments, such as hydraulic fracturing, are techniques used to enhance oil and gas production by increasing the permeability of the underground geological formation.  (§§ 3152, 3157.)  Hydraulic fracturing—or "fracking"—involves the pressurized injection of fluids into the formation to create fissures that allow oil and gas to escape for collection in a well.  (§ 3152.)  Hydraulic fracturing has been legally performed in California for decades.  (§§ 3106, subd. (b), 3160, subd. (b).)  However, the practice has not, until recently, been the subject of systematic study.  (Stats. 2013, ch. 313, § 1.)  As a result, little was known about the environmental consequences of well stimulation treatments.  (*Ibid.*)  The Legislature passed Senate Bill No. 4 in an attempt to remedy this problem.  (*Ibid.*)

---

[1] Undesiganted statutory references are to the Public Resources Code.

[2] All references to the EIR are to the final EIR unless otherwise indicated.

*A.      Senate Bill No. 4*

In passing Senate Bill No. 4, the Legislature found that hydraulic fracturing and other well stimulation treatments "are spurring oil and gas extraction and exploration in California." (Stats. 2013, ch. 313, § 1(a).) The Legislature also determined that, "[i]nsufficient information is available to fully assess the science of the practice of hydraulic fracturing and other well stimulation treatment technologies in California, including environmental, occupational, and public health hazards and risks." (Stats. 2013, ch. 313, § 1(b).) Accordingly, the Legislature declared that, "[p]roviding transparency and accountability to the public regarding well stimulation treatments, including, but not limited to, hydraulic fracturing, associated emissions to the environment, and the handling, processing, and disposal of well stimulation and related wastes, including from hydraulic fracturing, is of paramount concern." (Stats. 2013, ch. 313, § 1(c).)

Senate Bill No. 4 addressed these concerns by adding a number of new statutory provisions, including sections 3150 to 3161.[3] These provisions changed the regulatory environment for hydraulic fracturing and other well stimulation treatments in several ways. First, the Legislature defined the relevant industry terms. (§§ 3150-3159.) Of particular significance here, the Legislature defined the term "well stimulation treatment" as follows: "(a) For purposes of this article, 'well stimulation treatment' means any treatment of a well designed to enhance oil and gas production or recovery by increasing the permeability of the formation. Well stimulation treatments include, but are not

---

[3] Sections 3150 to 3161 were codified as new Article 3 (under the heading "Well Stimulation"), under Chapter 1, of Division 3 ("Oil and Gas"), of the Public Resources Code. Other statutes enacted or revised by Senate Bill No. 4 addressed penalties for noncompliance, further reporting and disclosure requirements, and groundwater monitoring. (§§ 3213, 3215, 3236.5; Wat. Code, § 10783; see Stats. 2013, ch. 313, §§ 3-5, 7.)

3

limited to, hydraulic fracturing treatments and acid well stimulation treatments. [¶] (b) Well stimulation treatments do not include steam flooding, water flooding, or cyclic steaming and do not include routine well cleanout work, routine well maintenance, routine removal of formation damage due to drilling, bottom hole pressure surveys, or routine activities that do not affect the integrity of the well or the formation." (§ 3157.) The Legislature defined "hydraulic fracturing" to mean "a well stimulation treatment that, in whole or in part, includes the pressurized injection of hydraulic fracturing fluid or fluids into an underground geologic formation in order to fracture or with the intent to fracture the formation, thereby causing or enhancing, for the purposes of this division, the production of oil or gas from a well." (§ 3152.) The Legislature defined "acid well stimulation treatment" to mean "a well stimulation treatment that uses, in whole or in part, the application of one or more acids to the well or underground geologic formation. The acid well stimulation treatment may be at any applied pressure and may be used in combination with hydraulic fracturing treatments or other well stimulation treatments." (§ 3158.)

Second, the Legislature required the California Natural Resources Agency to "cause to be conducted, and completed, an independent scientific study on well stimulation treatments, including, but not limited to, hydraulic fracturing and acid well stimulation treatments." (§ 3160, subd. (a).) The Legislature specified that the study was to "evaluate the hazards and risks and potential hazards and risks that well stimulation treatments pose to natural resources and public, occupational, and environmental health and safety." (*Ibid.*) The Legislature also specified that the study was to have been completed, "[o]n or before January 1, 2015." (*Ibid.*)

Third, the Legislature directed the Department to adopt permanent regulations specific to well stimulation treatments by January 1, 2015, which would become effective

4

on July 1, 2015.  (§ 3160, subd. (b)(1)(A).)[4]  The permanent regulations would include, "rules and regulations governing construction of wells and well casings to ensure integrity of wells, well casings, and the geologic and hydrologic isolation of the oil and gas formation during and following well stimulation treatments, and full disclosure of the composition and disposition of well stimulation fluids, including, but not limited to, hydraulic fracturing fluids, acid well stimulation fluids, and flowback fluids."  (*Ibid.*)

Fourth, the Legislature established new permit requirements—separate from the permits needed to drill or redrill wells—for conducting well stimulation treatments on oil and gas wells.  (*Association of Irritated Residents v. Department of Conservation* (2017) 11 Cal.App.5th 1202, 1211.)  Under Senate Bill No. 4, oil and gas operators must apply for a permit from the Department prior to performing well stimulation treatments on oil and gas wells.  (§ 3160, subd. (d)(1); see also § 3160, subd. (d)(3)(B) [well stimulation treatments "shall not be performed on any well without a valid permit"].)  Applications for well stimulation permits must include well identification numbers and locations, the time period in which well stimulation treatments are expected to occur, water management plans, complete lists of the chemicals and estimated concentrations of the chemical constituents of the well stimulation fluids anticipated to be used, groundwater monitoring plans, estimates of the waste materials expected to be generated, and plans for disposing of such materials.  (§ 3160, subd. (d)(1)(A)-(G).)  Senate Bill No. 4 requires that the Department, in considering permit applications, "evaluate the quantifiable risk of the well stimulation treatment."  (§ 3160, subd. (d)(3)(C).)  If granted, the well stimulation permit is valid for one year.  (§ 3160, subd. (d)(4).)

---

[4] In June 2014, an amendment to Senate Bill No. 4 stated that, although the regulations must be finalized by January 1, 2015, the effective date of the regulations was extended to July 1, 2015. (Stats. 2014, ch. 35, § 131, enacting Sen. Bill No. 861; see § 3161, subd. (a).)

Fifth, the Legislature established an interim statutory regime for well stimulation treatments for the eighteen month period beginning January 1, 2014 (the effective date of Senate Bill No. 4), and ending July 1, 2015 (when the permanent regulations would take effect). (§ 3161.) To this end, Senate Bill No. 4 specifies that the Department "shall allow" well stimulation activities to continue, provided that certain conditions are met. (§ 3161, subd. (b); see also *Association of Irritated Residents v. Department of Conservation, supra,* 11 Cal.App.5th at p. 1213 [" 'As directed in Public Resources Code section 3161, [the Department] must allow, and will allow, well stimulation to proceed if the operator has provided all of the required information and certifications' "].) As relevant here, Senate Bill No. 4 contemplates that the Department will commence "the preparation of an environmental impact report (EIR) pursuant to [CEQA], to provide the public with detailed information regarding any potential environmental impacts of well stimulation in the state." (§ 3161, subd. (b)(3)(A).) As we shall discuss, the meaning of the mandate to prepare an EIR "pursuant to CEQA" is a central question posed by this appeal.

Senate Bill No. 4 specifies that, "[t]he EIR shall address the issue of activities that may be conducted as defined in Section 3157 and that may occur at oil wells in the state existing prior to, and after, January 1, 2014." (§ 3161, subd. (b)(3)(A)(ii).) Senate Bill No. 4 further specifies that any such EIR was required to be certified by the Department as the lead agency "no later than July 1, 2015." (§ 3161, subd. (b)(3)(B)(i).) Senate Bill No. 4 clarifies that, notwithstanding the requirement that the Department prepare an EIR, local lead agencies would not be prohibited from preparing their own EIRs. (§ 3161, subd. (b)(3)(C).)

Finally, Senate Bill No. 4 provides that it "does not relieve [the Department] or any other agency from complying with any other provision of existing laws, regulations, and orders." (§ 3160, subd. (n).) "Presumably, this general provision would mean that Senate Bill No. 4 did not relieve [the Department] of its responsibility to comply with

6

CEQA where applicable." (*Association of Irritated Residents v. Department of Conservation, supra,* 11 Cal.App.5th at p. 1213.)

B.     *The EIR*

The Department issued a notice of preparation of an EIR on November 15, 2013, and published a draft EIR on January 14, 2015. The Department circulated the draft EIR for an extended 62-day public review and comment period, and conducted public meetings to receive comments on it. The Department responded to these comments and incorporated revisions into the final EIR, which was certified on July 1, 2015, as required by Senate Bill No. 4. (§ 3161, subd. (b)(3)(B)(i).)

The EIR spans three volumes and runs to more than 5500 pages. It includes more than 2500 pages of discussion and analysis, an additional 700-plus pages of responses to public comments and approximately 2000 pages of appendices. The administrative record also includes some of the reference materials used to prepare the EIR, which run to more than 116,000 pages.

The EIR begins with a discussion of Senate Bill No. 4. The EIR incorporates Senate Bill No. 4's definition of "well stimulation treatments" (§ 3157) and describes the "project," for purposes of CEQA, as "all activities associated with a stimulation treatment that could occur either at an existing oil and gas well, or at an oil and gas well that is drilled in the future expressly for the purposes of stimulation treatment." (See Cal. Code Regs., tit. 14, §§ 15120 & 15124 [an EIR must contain a project description defining the location of the proposed project, the objectives sought by the proposed project, the technical, economic and environmental characteristics of the project, and the intended uses of the EIR].)[5]

_____

[5] The regulations implementing CEQA are codified at California Code of Regulations, title 14, section 15000 et seq., and are referred to as the State CEQA Guidelines (hereafter, Guidelines).

7

The EIR contains a "programmatic" analysis of the environmental impacts of well stimulation treatments, with separate, standalone sections for aesthetics; agriculture and forestry resources; air quality; biological resources (both terrestrial and coastal and marine); coastal processes and marine water quality; commercial and recreational fishing; cultural resources; paleontological resources; environmental justice; geology; soils and mineral resources; greenhouse gas emissions; hazards and hazardous materials; groundwater resources; surface water resources; land use and planning; noise and vibration; population and housing; public services; recreation; risk of upset/public and worker safety; transportation and traffic; and utilities and service systems. Each of these sections ranges in length from nine pages (for commercial and recreational fishing) to 100 pages (for cultural resources). As we shall discuss, the Center contends the EIR fails to analyze certain indirect impacts of the "project," namely, emissions caused by pumping and transporting oil or gas produced by stimulated wells, traffic from pumping and transporting oil or gas produced from stimulated wells, and disposal of wastewater from stimulated wells, including the use of such wastewater to irrigate crops.

The draft EIR contained mitigation measures designed to minimize some of the environmental impacts of well stimulation treatments, including some of the indirect impacts referenced above. During the comment period, however, a number of commentators, including the Western States Petroleum Association (Petroleum Association), argued that some of the mitigation measures included in the draft EIR would be "underground regulations" in violation of the Administrative Procedures Act (Gov. Code, § 11340 et seq. (the APA)).[6] (See generally *Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 258-264 (*Center for Biological Diversity*) [imposition of statewide mitigation measures on private fish

---

[6] Petroleum Association is a respondent in intervention in this action.

8

vendors were "underground regulations" in violation of the APA].)  Accordingly, the Department eliminated some of the previously proposed mitigation measures from the final EIR, converting some into formal regulations and compiling others into a "Mitigation Policy Manual" that the Department proposed to use as a starting point for evaluating applications for permits to conduct well stimulation treatments at specific sites.  Although the EIR analyzes some of the indirect impacts of well stimulation treatments, the Department determined that such indirect impacts could not be mitigated by conditions of approval imposed on well stimulation treatment permits.  As we shall discuss, the Center contends the EIR fails to adopt enforceable mitigation measures, and fails to mitigate indirect impacts of well stimulation treatments.

The EIR is a "programmatic" or "first-tier" analysis of well stimulation treatments in the State of California.  As we shall discuss, "program EIRs" are typically more conceptual and abstract than "project EIRs," and may serve as the first tier for a subsequent, site specific CEQA review.  Although the EIR describes itself as a programmatic analysis of well stimulation treatments throughout the state, the document also includes a "programmatic level analysis" of three specific oil and gas fields:  the Wilmington and Inglewood oil fields in Los Angeles County, and the Sespe oil field in Ventura County.  According to the EIR, "the purpose of the site-specific programmatic level analysis contained in this EIR is to provide [the Department] with site-specific environmental documentation required for CEQA compliance in order to review future oil and gas well stimulation treatment applications associated with the Wilmington, Inglewood, and Sespe Oil and Gas Fields."  As we shall discuss, the Center contends the EIR's field-specific analyses are legally inadequate and cannot be used as the basis for approving new projects at the three sites without additional CEQA review.

For all its heft, the EIR omits some of the elements commonly found in EIR's, such as findings and a mitigation monitoring and reporting program.  As we shall discuss, the Center contends these omissions violate CEQA and Senate Bill No. 4.

9

*C.*     *The Certification Statement*

The EIR was accompanied by a certification statement signed by the State Oil and Gas Supervisor.  The certification statement discusses Senate Bill No. 4 and outlines the Department's understanding of the requirement that the agency prepare an EIR pursuant to CEQA.  (§ 3161, subd. (b)(3)(A).)  The certification statement explains:  "The EIR mandated by Senate Bill [No.] 4 is not an ordinary EIR, but rather is a rare, and possibly unique, CEQA document in that it was mandated by statute without any accompanying 'proposed project' requiring action by [the Department] or any other public agency.  The subject of the EIR, 'well stimulation in the state,' is not a pending 'project' in any ordinary sense.  Rather, the subject of the EIR is a set of ongoing activities likely to continue to be carried out throughout some parts of a huge and very diverse [s]tate.  Such activities were legally occurring at the time S[enate ]B[ill No.] 4 was passed, and in fact had been occurring for decades."  As we shall discuss, the certification statement anticipates and addresses many of the issues raised herein.

*D.*     *The Study*

As previously discussed, Senate Bill No. 4 required the Natural Resources Agency to "cause to be conducted, and completed, an independent scientific study on well stimulation treatments, including, but not limited to, hydraulic fracturing and acid well stimulation treatments."  (§ 3160, subd. (a).)  The Natural Resources Agency commissioned the California Council on Science and Technology (Council) to prepare the study, which was to have been completed on or before January 1, 2015.[7]  (§ 3160, subd. (a).)

The study was released in three volumes.  The first volume was released on January 14, 2015, the date on which the Department circulated the draft EIR.  The second

---

[7] The Department was not involved in the preparation of the study.

and third volumes were released on July 9, 2015, after the Department had certified the EIR.

As we shall discuss, the Center contends the Department violated Senate Bill No. 4 and CEQA by failing to incorporate the complete study into the EIR, failing to consider the first volume of the study, and failing to supplement the EIR or issue a subsequent EIR after the second and third volumes were released.

E.      *Procedural History*

The Center filed an initial petition for writ of mandate and complaint for declaratory and injunctive relief on July 30, 2015.  The Petroleum Association filed a motion to intervene, which was granted.  The Center then filed the operative first amended petition and complaint for declaratory and injunctive relief.

The first amended petition asserts five causes of action:  (1) violations of CEQA for approving or carrying out a program of well stimulation in the State of California in reliance on an inadequate EIR; (2) violations of Senate Bill No. 4 for failing to prepare an EIR that meets CEQA requirements; (3) declaratory relief for CEQA violations seeking a judicial declaration that the EIR cannot be used for subsequent project approvals; (4) declaratory relief for violations of Senate Bill No. 4 seeking a judicial declaration that the EIR cannot be used to approve subsequent projects without preparing a subsequent or supplemental EIR incorporating the information contained in the study; and (5) injunctive relief.

The Department demurred to the first amended petition on grounds of ripeness. Specifically, the Department argued that all of the Center's causes of action were unripe because the EIR was an informational document only, unconnected to any proposed project requiring discretionary approval by the Department (or any other agency).  The trial court overruled the demurrer with respect to the Center's causes of action for violations of Senate Bill No. 4 for failing to prepare an EIR that meets CEQA requirements (the second cause of action), declaratory relief for CEQA violations (the

11

third cause of action), declaratory relief for violations of Senate Bill No. 4 (the fourth cause of action), and injunctive relief (the fifth cause of action). However, the trial court sustained the demurrer to the Center's CEQA cause of action (the first cause of action) without leave to amend.

The trial court held a hearing on the merits of the petition on August 26, 2016. The trial court issued an order denying the petition on October 27, 2016. The order also denied the Center's request for judicial notice of the second and third volumes of the study.

The trial court entered judgment on November 28, 2016. This appeal timely followed.

## II. DISCUSSION

The Center argues the EIR violates Senate Bill No. 4 and CEQA. The Center challenges the trial court's order sustaining the Department's demurrer to the CEQA cause of action, the denial of its request for judicial notice of volumes two and three of the study, and the denial of its petition for writ of mandate. We will begin our analysis with an overview of CEQA and the relevant requirements for EIR's, bearing in mind that the present EIR charts a different course than most. We will then address the Center's contentions and applicable standards of review.

*A.    CEQA Overview*

"CEQA was enacted to advance four related purposes to: (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382 (*CBIA*)).

12

"To further these goals, CEQA requires that agencies follow a three-step process when planning an activity that could fall within its scope. [Citations.] First, the public agency must determine whether a proposed activity is a '[p]roject,' i.e., an activity that is undertaken, supported, or approved by a public agency and that "may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment.' " (*CBIA, supra,* 62 Cal.4th at p. 382.) "Second, if the proposed activity is a project, the agency must next decide whether the project is exempt from the CEQA review process under either a statutory exemption [citation] or a categorical exemption set forth in the CEQA Guidelines [Citations]. If the agency determines the project is not exempt, it must then decide whether the project may have a significant environmental effect. And where the project will not have such an effect, the agency 'must "adopt a negative declaration to that effect." ' " (*Ibid.*) "Third, if the agency finds the project 'may have a significant effect on the environment,' it must prepare an EIR before approving the project." (*Ibid.*)

"When an agency prepares an EIR, it provides public officials and the general public with details about a proposed project's consequences. The EIR also lists the ways to potentially minimize any significant environmental effects, and presents alternatives to the project. [Citations.] By making this information available to decision makers and the public at a crucial moment when the merits of a project and its alternatives are under discussion, an EIR advances not only the goal of environmental protection but of informed self-government." (*CBIA, supra,* 62 Cal.4th at p. 383.)

B.      *Demurrer to CEQA Cause of Action*

The Center argues that the trial court erred in sustaining the Department's demurrer to its cause of action for violations of CEQA for approving or carrying out a program of well stimulation in the state. The Center fails to demonstrate error.

A cardinal rule of appellate review is that the judgment or order of the trial court is presumed correct and prejudicial error must be shown. (*Denham v. Superior Court*

13

(1970) 2 Cal.3d 557, 564; see *Baldwin v. AAA Northern California, Nevada & Utah Ins. Exchange* (2016) 1 Cal.App.5th 545, 549 ["Appellant bears the burden of demonstrating that the trial court erred in sustaining the demurrer"].) " ' "Although our review of a [demurrer] is de novo, it is limited to issues [that] have been adequately raised and supported in plaintiffs' brief. [Citations.] Issues not raised in an appellant's brief are deemed waived or abandoned." ' " (*Pfeifer v. Countrywide Home Loans, Inc.* (2012) 211 Cal.App.4th 1250, 1282; see also *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [court will not develop appellants' arguments for them].)

As noted, the trial court sustained the Department's demurrer to the CEQA cause of action on ripeness grounds. Specifically, the trial court determined the CEQA cause of action was unripe because there was no project before the Department requiring approval. On appeal, the Center treats the trial court's ruling as a determination that there was no project to analyze, rather than a determination that there was no project requiring approval. Having thus framed the issue, the Center expends considerable energy arguing that the "project," for purposes of CEQA, was defined by Senate Bill No. 4 as "well stimulation in the state." But this argument, which the Department does not dispute, does not address the question of ripeness, which formed the basis for the trial court's ruling.

In the alternative, the Center argues the trial court erred because, though the Department may not have approved a project in reliance on the EIR, it was "carrying out" a program of regulating, overseeing and permitting well stimulation in reliance on the EIR, and that program was itself a "project" within the meaning of CEQA. (See § 21065 [defining "project," in pertinent part, as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity undertaken by any public agency"]; and see Guidelines, § 15378, subd. (a) [defining "project," in pertinent part, as "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical

14

change in the environment, and that is any of the following: [¶] (1) An activity directly undertaken by any public agency including but not limited to public works construction and related activities clearing or grading of land, improvements to existing public structures, enactment and amendment of zoning ordinances, and the adoption and amendment of local General Plans or elements thereof pursuant to Government Code Sections 65100-65700"].) This argument does not help the Center.

Contrary to the Center's contention, the Department does not carry out a program or "project" of well stimulation in the state. That the Department regulates well stimulation activities in the state does not imply that the Department "directly undertake[s]" such activities. Furthermore, though the Department oversees a regulatory program encompassing well stimulation activities in the state, that program was not the "project" that the Department was charged with examining.[8] (§ 3161, subd. (b)(3)(A).) We therefore reject the Center's contention that the Department carries out a program or "project" of well stimulation in the state.[9] As we shall discuss, our conclusion compels us to reject many of the Center's other contentions, a number of which proceed from the same premise.

C. *Request for Judicial Notice*

The Center argues the trial court erred in refusing to take judicial notice of the second and third volumes of the study. We apply the abuse of discretion standard of review to any ruling by the trial court on admissibility of evidence, including requests for

---

[8] The Department conducted a separate CEQA review in connection with the proposed rulemaking for the permanent regulations required by Senate Bill No. 4, and determined that the proposed rulemaking was categorically exempt from CEQA. Neither the Center nor any other party has challenged that determination.

[9] As noted, the CEQA cause of action was based on the allegation that the Department "violated CEQA by approving or carrying out a program of well stimulation in . . . reliance on an EIR that is inadequate."

15

judicial notice. (*In re Social Services Payment Cases* (2008) 166 Cal.App.4th 1249, 1271.) A trial court's decision "not to take judicial notice will be upheld on appeal unless the reviewing court determines that the party furnished information to the trial court that was so persuasive that no reasonable judge would have refused to take judicial notice of the matter. [Citation.]" (*Willis v. State of California* (1994) 22 Cal.App.4th 287, 291.) The Center fails to establish an abuse of discretion.

The Center argues the trial court's ruling was erroneous because the second and third volumes of the study were relevant to the claim that the Department should have supplemented the EIR or issued a subsequent EIR on the basis of new information in the later volumes. But the Center did not argue this theory of relevance in the trial court. Instead, the Center sought judicial notice of the second and third volumes on the ground that they were relevant to the claim that the Department violated Senate Bill No. 4 by failing to incorporate the study into the EIR (a claim we take up momentarily). The trial court denied the request, reasoning that that the second and third volumes were not before the Department at the time the EIR was prepared and certified. (See *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573, fn. 4 [holding that it would be improper to take judicial notice of evidence that was both absent from the administrative record and not before the agency at the time of its decision because such evidence is not relevant].)

The Center does not address the basis for the trial court's ruling. Instead, the Center suggests the trial court abused its discretion in failing to consider its newly articulated theory of relevance. Even assuming that we could consider the Center's new theory on appeal, we would reject it. (*Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 640 [party may not raise for first time on appeal a new theory to support or contest admissibility].) The trial court was not obliged to read between the lines of the Center's request for judicial notice to divine an unasserted theory of relevance, and we cannot say

16

the court abused its discretion for failing to do so. We therefore reject the Center's challenge to the denial of the request for judicial notice.[10]

### D.     The EIR Complies with Senate Bill No. 4 and CEQA

The Center argues the Department violated Senate Bill No. 4 and CEQA by failing to incorporate the complete study into the EIR, failing to consider the first volume of the study (which was available at the time the EIR was certified) and failing to supplement the EIR or issue a subsequent EIR after the second and third volumes were issued. The Center also argues the Department violated CEQA by: (1) failing to analyze indirect or secondary impacts of well stimulation treatments; (2) failing to adequately analyze the use of well stimulation treatments at the Wilmington, Inglewood and Sespe oil fields; (3) failing to adopt enforceable mitigation measures; and (4) failing to make findings and adopt a mitigation monitoring and reporting plan.

#### 1.     Standard of Review

Our review in a CEQA case, as in other mandamus actions, is the same as that of the trial court. We review the agency's decision, not that of the trial court, and our inquiry extends only to whether there has been a prejudicial abuse of discretion on the part of the agency. (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1161 (*Bay-Delta*); §§ 21168.5 ["In any action or proceeding . . . to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion"], 21005, subd. (a) [noncompliance with information disclosure requirements may "constitute a prejudicial abuse of discretion"].) "Where an EIR is challenged as being legally inadequate, a court presumes a public agency's decision to certify the EIR is correct, thereby imposing on a party challenging it the burden of

---

[10] The Center has not filed a request for judicial notice in this court.

17

establishing otherwise." (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530.)

An agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA requires or by reaching factual conclusions unsupported by substantial evidence. (§ 21168.5 ["Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence"]; see also § 21005, subd. (a) [noncompliance with information disclosure requirements may "constitute a prejudicial abuse of discretion"].) " 'Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." ' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512.)

As we have suggested, the present case requires us to apply these standards to an unusual EIR. The parties have not directed our attention to any other case in which the Legislature directed an agency to prepare an EIR in the absence of a pending project or regulatory program requiring approval, and our own research has uncovered none. In the absence of any authority directly on point, we look for guidance in the case law concerning analogous "program" EIR's. We discuss the most relevant of these cases below, and then turn to the Center's specific contentions.

2.      *Program EIR's and Tiering*

"CEQA allows public agencies to use special types of EIR's to simplify preparation and avoid duplication. [Citations.] [¶] One of those EIR's is a program EIR." (*Center for Biological Diversity, supra,* 234 Cal.App.4th at p. 233.) A program

18

EIR is "an EIR which may be prepared on a series of actions that can be characterized as one large project" and are related in specified ways.  (Guidelines, § 15168, subd. (a); *Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 343 (*Town of Atherton*).)  By contrast, "[a] project EIR is typically used for a specific development project."  (*North Coast Rivers Alliance v. Kawamura* (2015) 243 Cal.App.4th 647, 664; see also Guidelines, § 15161 ["The most common type of EIR examines the environmental impacts of a specific development project"].)  As our Supreme Court has noted, "a *program* EIR is distinct from a *project* EIR, which is prepared for a specific project and must examine in detail site-specific considerations."  (*Bay-Delta, supra,* 43 Cal.4th at p. 1169 [citing Guidelines, § 15161].)  It is undisputed that the instant EIR was a program EIR, rather than a project EIR.

"Program EIR's are commonly used in conjunction with the process of tiering."  (*Bay-Delta, supra,* 43 Cal.4th at p. 1170.)  " 'Tiering' refers to using the analysis of general matters contained in a broader EIR (such as one prepared for a general plan or policy statement) with later EIR[']s and negative declarations on narrower projects; incorporating by reference the general discussions from the broader EIR; and concentrating the later EIR or negative declaration solely on the issues specific to the later project."  (Guidelines, § 15152, subd. (a); see also *Bay-Delta, supra,* at p. 1170 ["Tiering is 'the coverage of general matters in broader EIR[']s (such as on general plans or policy statements) with subsequent narrower EIR[']s' "].)  "Tiering is proper 'when it helps a public agency to focus upon the issues ripe for decision at each level of environmental review and in order to exclude duplicative analysis of environmental effects examined in previous environmental impact reports.' "  (*Bay-Delta, supra,* at p. 1170.)

We discern the following principles relevant to our analysis of the subject EIR. First, a program EIR may appropriately defer discussion of site specific impacts and mitigation measures to later project EIR's where such " 'impacts or mitigation measures

are not determined by the first-tier approval decision but are specific to the later phases' " (*Bay-Delta, supra,* 43 Cal.4th at p. 1170; *Town of Atherton, supra,* 228 Cal.App.4th at p. 346.)  Second, the sufficiency of a program EIR must be reviewed in light of what is reasonably feasible, given the nature and scope of the project.  (*Center for Biological Diversity, supra,* 234 Cal.App.4th at p. 234; see also *Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 533 [" 'The level of specificity of an EIR is determined by the nature of the project and the "rule of reason" [citation], rather than any semantic label accorded to the EIR' "]; and see Guidelines, § 15151 ["An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible"].)  Third, in considering a challenge to a program EIR, we focus on "whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citations.]"  (*Sierra Club v. County of Fresno, supra,* 6 Cal.5th at p. 516; see also *San Franciscans for Livable Neighborhoods v. City and County of San Francisco* (2018) 26 Cal.App.5th 596, 608 ["in considering a challenge to a program EIR, ' " it is unconstructive to ask whether the EIR provided 'project-level' as opposed to 'program-level' detail and analysis.  Instead, we focus on whether the EIR provided 'decision makers with sufficient analysis to intelligently consider the environmental consequences of [the] project' " ' "].)  As previously discussed, this inquiry presents a mixed question of law and fact, and is generally subject to independent review.  (*Sierra Club v. County of Fresno, supra,* at p. 516.)

     *3.    The Study*

     The Center argues the Department violated Senate Bill No. 4 and CEQA by failing to incorporate the complete study into the EIR.  As previously discussed, Senate Bill No. 4 contemplated that the study would be completed on or before January 1, 2015, and the EIR would be certified no later than July 1, 2015.  (§§ 3160, subd. (a), 3161, subd.

20

(b)(3)(B)(i).)  According to the Center, these statutory deadlines evince a legislative intent to require the Department to incorporate the complete study into the EIR, which the Department violated by certifying the EIR on July 1, 2015, before the second and third volumes were completed.  We perceive no violation of Senate Bill No. 4.

We apply a de novo standard of review to questions of statutory interpretation. (*Concerned Dublin Citizens v. City of Dublin* (2013) 214 Cal.App.4th 1301, 1311.) " 'Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose.' " (*Carson Citizens for Reform v. Kawagoe* (2009) 178 Cal.App.4th 357, 365; see *Fluor Corp. v. Superior Court* (2015) 61 Cal.4th 1175, 1198.) " ' "We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent." [Citations.]  The plain meaning controls if there is no ambiguity in the statutory language.  [Citation.]  If, however, "the statutory language may reasonably be given more than one interpretation, ' " 'courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute.' " ' " ' " (*Fluor Corp., supra,* at p. 1198.)

Here, we need look no further than the words of Senate Bill No. 4.  Section 3160, subdivision (a) directs the Natural Resources Agency to cause the study to be "conducted, and completed," on or before January 1, 2015.  A separate statute directs the Department to prepare an EIR "pursuant to [CEQA], to provide the public with detailed information regarding any potential environmental impacts of well stimulation in the state," (§ 3161, subd. (b)(3)(A)) and certify the EIR "no later than July 1, 2015."  (§ 3161, subd. (b)(3)(B)(i).)  It is true, as the Center argues, that sections 3160 and 3161 establish staggered deadlines for the preparation of two informational documents dealing with the same subject matter.  But nothing in Senate Bill No. 4 suggests that the Legislature

21

intended to link the preparation of the study to the preparation of the EIR. Section 3160, which requires the completion of the study, says nothing about the EIR. (§ 3160.) And section 3161, which requires the preparation of an EIR, says nothing about the study. (§ 3161.) Neither statute connects either document to the other, and nothing suggests that any delay in preparing the study would or could excuse the Department from certifying the EIR "no later than July 1, 2015." We therefore reject the Center's contention that Senate Bill No. 4 required the Department to incorporate the study into the EIR.

The Center argues this interpretation of Senate Bill No. 4 undermines the purpose of the statutory scheme—to inform the public about the potential environmental impacts of well stimulation treatments—by allowing the Department to certify the EIR without considering the information contained in the study. However, the Legislature could have rationally concluded that the independent production of two separate reports, with differing purposes and areas of emphasis, would effectuate Senate Bill No. 4's remedial purposes by increasing the overall quantum of information about well stimulation treatments. And the Legislature could have also concluded that it would be preferable, though not essential, for the study to be completed before the EIR was certified, particularly inasmuch as the EIR was likely to be (and was) a first-tier program EIR. Certainly, the Legislature could have expressly required that the Department postpone certification of the EIR in the event that the study was not timely completed. That the Legislature chose not to do so demonstrates an intent to keep the documents and processes by which they were prepared separate. We cannot impose a requirement that the Legislature declined to impose, and we cannot say that the Department violated Senate Bill No. 4—or undermined its essential purpose—by certifying the EIR on July 1, 2015, as section 3161, subdivision (b)(3)(b)(i) required.

The Center next argues that the Department violated CEQA by failing to consider the first volume of the study, which was released on January 14, 2015, before the certification date. CEQA requires that an EIR make "a good faith effort at full

disclosure." (Guidelines, § 15151.) "An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. Disagreement among experts does not make an EIR inadequate, but the EIR should summarize the main points of disagreement among experts. The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (*Ibid.*; see also *Berkeley Keep Jets Over the Bay Committee v. Board of Port Commissioners* (2001) 91 Cal.App.4th 1344, 1367 [" ' " 'Where comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. There must be good faith, reasoned analysis in response' " ' " (italics omitted)].)

The EIR discloses the existence of the first volume, expresses a willingness to consider the as yet unreleased future volumes, and observes that, "as of the time that the Final EIR was published, no substantive conflicts between its conclusions and the conclusions of Volume I of the Independent Study had been identified." Although the EIR does not delve into the substance of the first volume, it clearly discloses the existence of the study and makes a reasonable effort to inform the public of the absence of any identified "substantive conflicts" between the conclusions set forth in the two documents. We conclude these disclosures were adequate under the circumstances.

The Center argues that the study conflicts with the EIR in multiple respects, and the EIR should have disclosed these differences of opinion. However, the Center's citations to the record make clear that most of the asserted conflicts are based on conclusions contained in the second and third volumes, which had not been released at the time the Department certified the EIR and are not properly before us now. We do not

23

consider any of the asserted conflicts between the EIR and the second and third volumes of the study.

Setting the second and third volumes aside, the Center argues that the EIR should have disclosed the first volume's prediction that, "[t]he most likely scenario for future oil recovery using hydraulic fracturing is expanded production in and near existing oil fields in the San Joaquin Basin in a manner similar to the production practices of today." According to the Center, the Department improperly relied on confidential business plans provided by the Petroleum Association to conclude that, "California is anticipated to experience declining production with the management of older reservoirs." The Center argues that the Department should have disclosed the study's prediction, and provided a reasoned basis, supported by substantial evidence, for its decision to rely on the supposedly contradictory information supplied by the Petroleum Association. We do not perceive any necessary inconsistency between these predictions.

The San Joaquin Basin is one of five major sedimentary basins in California with reservoirs of known economically viable oil and gas resources. The San Joaquin Basin holds some of California's most productive oil fields. The Monterey Formation is a petroleum system comprised of permeable rock through which petroleum migrates. The Monterey Formation is one of the largest petroleum systems in the United States, and the source of the oil and gas resources in the San Joaquin Basin.

The EIR discusses the Monterey Formation at length, noting that, "California's largest petroleum reserves lie in the Monterey Formation, although estimated recoverable reserves are unknown at this time and estimates vary." The EIR predicts that future oil and gas production in California will primarily occur within existing fields in the Monterey Formation, and will require well stimulation treatments. The EIR relies on business plans from the Petroleum Association members in an attempt to forecast future production for the next 25 years. "In general," the EIR forecasts "declining production with the management of older reservoirs" for the state as a whole over a 25-year period.

24

For the study region that encompasses the San Joaquin Basin, the EIR anticipates that as many as 3,300 new production, producer, injection and other wells may be drilled every year over the next 25 years, and hydraulic fracturing may be used on approximately 40 to 55 percent of new production wells, and 40 to 62 percent of new injection wells. "In general," however, the EIR anticipates that production and drilling will "gradually decline over the next 25 years."

These projections are not necessarily inconsistent with the study's prediction that, "[t]he most likely scenario for future oil recovery using hydraulic fracturing is expanded production in and near existing oil fields in the San Joaquin Basin in a manner similar to the production practices of today." The EIR clearly discloses that hydraulic fracturing will likely take place within the Monterey Formation in general, and the study region that includes the San Joaquin Basin in particular. That the Department anticipated declining production over a 25 year horizon does not establish an inconsistency with the study's prediction that hydraulic fracturing would likely occur in the San Joaquin Basin, and does not suggest that the Department "ignored" any opinion or conclusion set forth in the first volume. We therefore reject the Center's contention that the Department failed to consider conflicting opinions or conclusions set forth in the first volume.

The Center argues that the Department should have issued a subsequent or supplemental EIR in light of the second and third volumes of the study. CEQA does not require the preparation of a subsequent or supplemental EIR unless new information of substantial importance comes to light. (§ 21166 ["When an environmental impact report has been prepared for a project . . . , no subsequent or supplemental environmental impact report shall be required . . . unless . . . [¶] . . . (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available"]; see also *Save Our Heritage Organization v. City of San Diego* (2018) 28 Cal.App.5th 656, 666 ["The project changes, changed circumstances, and new information referred to in section 21166 only require a

25

subsequent EIR if they involve new significant environmental effects, substantially more severe significant environmental effects, or newly feasible or different mitigation measures which would substantially reduce one or more significant environmental effects"].)

Whether an initial EIR remains relevant in light of new information or requires updating is a " 'predominantly factual question' " that courts review for substantial evidence. (*Committee for Re-Evaluation of T-Line Loop v. San Francisco Municipal Transportation Agency* (2016) 6 Cal.App.5th 1237, 1248.) We cannot reach this question on the record before us. Because the second and third volumes have not been made part of the record, and are not the subject of any pending request for judicial notice, we are unable to determine whether they contain significant new information that would necessitate a subsequent or supplemental EIR. We therefore reject the Center's contention that the Department was required to issue a subsequent or supplemental EIR following the release of the second and third volumes of the study.

### 4. *Indirect Impacts*

The Center argues the EIR fails to adequately address the indirect impacts of well stimulation treatments. Specifically, the Center argues the EIR fails to analyze emissions caused by pumping and transporting oil and gas produced by stimulated wells, traffic, and wastewater produced from stimulated wells. We conclude the Department was not required to analyze indirect impacts of well stimulation in the EIR, but nevertheless adequately analyzed them on a programmatic basis, properly deferring further analysis to later, project-level EIRs.

As previously discussed, Senate Bill No. 4 required the Department to prepare an EIR "pursuant to [CEQA], to provide the public with detailed information regarding any potential environmental impacts of well stimulation in the state." (§ 3161, subd. (b)(3)(A).) The Center correctly observes that an EIR prepared "pursuant to [CEQA]" would ordinarily include an analysis of the reasonably foreseeable indirect effects of a

project.  (See *Placerville Historic Preservation League v. Judicial Council of California* (2017) 16 Cal.App.5th 187, 195 ["an EIR must identify and discuss the ' " 'significant environmental effects' " ' of the proposed project [citation], which are defined as the 'direct, and reasonably foreseeable indirect 'physical changes in the environment' "].)  It is also true, as the Center notes, that the use of the word "any" signals an intent to encompass a broad range of potential impacts, rather than a narrow subset of direct impacts.  (See *Kurz v. Syrus Systems, LLC* (2013) 221 Cal.App.4th 748, 762 [" ' "The ordinary meaning of the word 'any' is clear, and its use in a statute unambiguously reflects a legislative intent for that statute to have a broad application" ' "].)  But the Center's argument for an expansive interpretation of section 3161, subdivision (b)(3)(A) gives short shrift to the rest of the statute, which reflects a legislative intent to limit the scope of the EIR to well stimulation treatments only.

Section 3161, subdivision (b)(3)(B)(ii) directly addresses the scope of the EIR and specifies the document "shall address the issue of activities that may be conducted as defined in Section 3157 and that may occur at oil wells in the state existing prior to, and after, January 1, 2014."  (§ 3161, subd. (b)(3)(B)(ii).)  Section 3157, in turn, defines "well stimulation treatment" to mean "any treatment of a well designed to enhance oil and gas production or recovery by increasing the permeability of the formation." (§ 3157, subd. (a).)  Section 3157 specifically excludes "steam flooding, water flooding, [and] cyclic steaming," and further provides that the definition of "well stimulation treatments" does not include "routine well cleanout work, routine well maintenance, routine removal of formation damage due to drilling, bottom hole pressure surveys, [and] routine activities that do not affect the integrity of the well or the formation."  (§ 3157, subd. (b).)  Some of these activities, such as routine well maintenance, could be characterized as indirect impacts of well stimulation treatments, and would ordinarily be included in an EIR prepared "pursuant to CEQA."  (See *Placerville Historic Preservation League v. Judicial Council of California, supra,* 16 Cal.App.5th at p. 195.)  But Senate

27

Bill No. 4 indicates that the Department was not expected to analyze such activities, however characterized. Thus, Senate Bill No. 4 and CEQA are inconsistent, so far as the scope of the EIR is concerned.

" 'A court must, where reasonably possible, harmonize statutes, reconcile seeming inconsistencies in them, and construe them to give force and effect to all of their provisions. [Citations.] This rule applies although one of the statutes involved deals generally with a subject and another relates specifically to particular aspects of the subject.' [Citation.] Thus, when ' "two codes are to be construed, they 'must be regarded as blending into each other and forming a single statute.' [Citation.] Accordingly, they 'must be read together and so construed to give effect, when possible, to all the provisions thereof.' " ' " (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 805.)

Reading section 3161 as a whole, and harmonizing the statute with the rest of the statutory scheme, we are convinced that Senate Bill No. 4 required the Department to prepare an EIR analyzing the environmental effects of well stimulation treatments only, as narrowly defined by section 3157. Nothing in Senate Bill No. 4 required an analysis of indirect impacts caused by the additional oil and gas production made possible by well stimulation treatments, and we do not believe that such a sweeping mandate can be reasonably implied from the instruction to prepare an EIR "pursuant to CEQA." We reiterate that the purpose of Senate Bill No. 4 was to address the dearth of information about the environmental effects of well stimulation treatments in particular, not oil and gas production in general. Our interpretation effectuates this purpose.[11]

---

[11] Having rejected the Center's expansive interpretation of Senate Bill No. 4, we need not decide whether the EIR adequately analyzes the indirect impacts of well stimulation in the state. We note, however, that the EIR analyzes emissions caused by pumping and transporting oil and gas produced by stimulated wells, traffic, and wastewater produced from stimulated wells on a statewide basis. We also note that more detailed analyses of

28

## 5. *Mitigation Measures*

The Center argues the EIR violates CEQA by failing to propose enforceable mitigation measures and failing to mitigate the indirect impacts of well stimulation treatments. The Department responds that CEQA only requires that a lead agency adopt mitigation measures when it approves a project, and here, there was no project before the agency for approval. The Department further responds that the agency committed to specific performance standards to mitigate the direct effects of well stimulation treatments in the Mitigation Policy Manual, and reasonably concluded that potential mitigation measures for the indirect effects of well stimulation treatments were infeasible.

We are inclined to agree with the Department that a lead agency has no obligation to adopt formal mitigation measures until such time as the agency approves or carries out a project. (See §§ 21002 ["public agencies should not *approve projects* as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects . . . ."], 21002.1, subd. (b) ["Each public agency shall mitigate or avoid the significant effects on the environment of projects *that it carries out or approves* whenever it is feasible to do so"], 21081 ["no public agency shall *approve or carry out a projec*t for which an environmental impact report has been certified which identifies one or more significant effects on the environment that would occur" unless the public agency makes findings

these indirect impacts would depend upon a variety of site-specific factors, including meteorological, topographical, and geological conditions, all of which could vary widely in a state as large and diverse as ours. Because Senate Bill No. 4 required a statewide analysis, we would likely conclude, if the question were before us, that the Department reasonably analyzed the indirect impacts of well stimulation on a programmatic basis, and properly deferred a more detailed analysis of such impacts to subsequent project EIR's. (See *Bay-Delta, supra,* 43 Cal.4th at p. 1176; *Town of Atherton, supra,* 228 Cal.App.4th at p. 346.)

that each significant effect will be mitigated], italics added.)  As previously discussed, the Department does not "carry out" a program of well stimulation in the state, and there was no project before the agency for discretionary approval.  Under the peculiar circumstances of this case, where the Department was directed by the Legislature to prepare an EIR for informational purposes only, in the absence of any particular project for approval, we do not believe that the Department had an obligation to adopt formal mitigation measures.  We need not decide this issue, however, as we conclude that: (1) the Department committed to specific performance criteria to mitigate the direct effects of well stimulation treatments in the Mitigation Policy Manual; and (2) the Department reasonably concluded that potential mitigation measures for the indirect effects of well stimulation treatments were infeasible.

> a.      *The Mitigation Policy Manual*

As previously discussed, the draft EIR contained mitigation measures designed to minimize the direct impacts of well stimulation treatments.  During the comment period, this court issued its opinion in *Center for Biological Diversity, supra,* 234 Cal.App.4th 214, which held, among other things, that mitigation measures adopted by a lead agency after preparation of an EIR for a statewide program could, in some circumstances, constitute illegal "underground regulations" in violation of the APA.  Relying on *Center for Biological Diversity*, *supra,* the Petroleum Association and others argued that some of the mitigation measures in the draft EIR would likewise constitute illegal underground regulations.  (*Id.* at p. 258.)  Accordingly, the Department converted some of the mitigation measures in the draft EIR into formal regulations, and compiled others in the Mitigation Policy Manual.

Generally, it is improper to defer the formulation of mitigation measures. (Guidelines, § 15126.4, subd. (a)(1)(B); *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 735.)  However, an exception to this general rule applies when the agency has committed itself to specific performance criteria for evaluating the efficacy of

30

the measures to be implemented in the future, and the future mitigation measures are formulated and operational before the project activity that they regulate begins. (*POET, supra,* at p. 738.) Both conditions are met here.

The certification statement describes the Department's commitment to the mitigation measures in the Mitigation Policy Manual as follows: "Importantly, the mitigation measures in the Mitigation Policy Manual will 'set a floor,' albeit a somewhat flexible one, for future mitigation that [the Department] will impose as permit conditions. In their final form after input from various stakeholders, the mitigation measures for individual permits or groups of permits will have to be substantially consistent with the measures found in the Mitigation Policy Manual. In determining whether a particular measure is substantially consistent with [the Department's] own recommended mitigation, [the Department] will take full account of the following: (i) any other lead agency's analysis as to whether a particular impact is significant and requires mitigation; and (ii) the extent to which the level of any impact reduction that would be achieved by the measure would be reasonably comparable to the level of mitigation that would have been achieved by the [Department]-recommended measures in the SB 4 EIR."

The Center suggests that the performance criteria set forth in the Mitigation Policy Manual are not sufficiently specific. However, the Mitigation Policy Manual spans more than 100 pages, and contains mitigation measures addressed to aesthetics; agriculture and forestry resources; air quality; biological resources (terrestrial environment); coastal processes and marine water quality; cultural resources; paleontological resources; environmental justice; geology, soils, and mineral resources; greenhouse gas emissions; hazards and hazardous materials; groundwater resources; surface water resources; noise and vibration; public services; risk of upset/public and worker safety; transportation and traffic; and utilities and service systems. The Mitigation Policy Manual also includes guidelines and checklists to ensure that the Department makes all relevant inquiries when acting as lead agency in evaluating future well stimulation projects. The Center does not

31

explain how the mitigation measures set forth in the Mitigation Policy Manual supposedly fall short, and we presume that the Department's recommendations are based on knowledgeable good faith. (See Evid. Code, § 664; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 ["A court's task is not to . . . determine . . . whether adverse effects . . . could be better mitigated. We have neither the resources nor the scientific expertise to engage in such analysis"].)

The Center also implies that the Department was not sufficiently committed to the specific performance criteria set forth in the Mitigation Policy Manual. However, the Department has committed to using the specific performance criteria in the Mitigation Policy Manual in several ways. First, the Department committed to using the Mitigation Policy Manual as a starting point for evaluating future well stimulation projects. Second, the Department committed to working with local lead agencies to ensure adequate mitigation for all site-specific impacts. Third, the Department announced that, when acting as lead agency for future projects, operators who wish to have their projects deemed within the scope of the EIR's analysis (thereby obviating the need for a second tier, project-level EIR) will need to comply with all measures set forth in the Mitigation Policy Manual virtually as written. Fourth, the Department committed to imposing additional mitigation measures on future projects as appropriate, either under its general supervisory jurisdiction over oil and gas operations or under its power to condition well stimulation permits in particular. Fifth, the Department committed to revising the Mitigation Policy Manual going forward, as it gains experience with future projects.

The Center questions the strength of the Department's commitment to the measures in the Mitigation Policy Manual, noting that the certification statement describes them as " 'a floor,' albeit a somewhat flexible one" and "not legally binding in the sense that measures found in an adopted mitigation reporting or monitoring program would be." But these statements are more fairly viewed as an acknowledgment of the fact that the Department decided to mitigate statewide impacts by means of regulations

32

approved through the formal rulemaking process, and site-specific impacts by means of the specific performance criteria set forth in the Mitigation Policy Manual. They do not lead us to believe that the Department's commitment to the measures in the Mitigation Policy Manual is illusory. Accordingly, we conclude that the EIR does not improperly defer mitigation of the direct impacts of well stimulation treatments.

### b. *Mitigation of Indirect Effects*

The Center argues the EIR fails to mitigate indirect effects of well stimulation treatments. The Department responds that the agency considered mitigation measures for the indirect effects of well stimulation treatments, but reasonably concluded that they were infeasible, and thus eliminated them from the final EIR. Substantial evidence supports the Department's determination that it was not feasible to mitigate the indirect effects of well stimulation treatments by imposing conditions on well stimulation permits.

An EIR must describe feasible measures that would reduce any of the project's significant environmental impacts. (Guidelines, § 15126.4, subd. (a)(1).) Feasible means "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (Guidelines, § 15364.) An EIR may properly decline to consider a proposed mitigation measure if substantial evidence supports the agency's determination that the proposed mitigation measure would not reduce a significant impact, or that the proposed mitigation measure is infeasible. (Guidelines, § 15126.4, subd. (a).) "Decisions as to the feasibility of . . . mitigation measures are subject to a rule of reason." (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 937.)

The EIR and certification statement acknowledge that one of the indirect effects of well stimulation treatments is the possibility that oil and gas operators may establish new fields in areas previously undeveloped for oil and gas. In this scenario, which appears to be the one with which the parties are primarily concerned, the indirect effects of well stimulation treatments would include the direct effects of oil and gas production. As

33

noted, the Department proposed mitigation measures for some of these indirect effects in the draft EIR, but eliminated them from the final EIR. The certification statement explains: "A handful of measures in the Draft EIR that contained language addressing the impacts of oil and gas production generally were modified or eliminated during the process of preparing the Final EIR. After receiving many comments objecting to the breadth of some of these original measures as found in the Draft EIR, [the Department] made these modifications because, even though it was appropriate under CEQA to disclose the possibility of significant indirect effects arising from hypothetical future new oil and gas production made possible by well stimulation, such indirect effects could not properly be mitigated by conditions of approval imposed on well stimulation treatment permits, which will be approved only after oil or gas wells are already in place."

We note, as the trial court did, that the certification statement overstates the extent to which a well drilling permit necessarily precedes a well stimulation permit. Under section 3160, subdivision (d)(2)(A), oil and gas operators can apply for well drilling and well stimulation permits concurrently, and receive approval for both by way of a "single combined authorization." (See also § 3203.) As a practical matter, however, an application for a well stimulation permit must include the location of the well, an identification number assigned by the Department, and other site-specific information. (Cal. Code Regs., tit. 14, § 1783.1, subd. (a)(6)-(7).) Thus, a well stimulation permit can only be finalized in conjunction with a well drilling permit, which would be subject to separate conditions of approval for such direct effects as emissions, traffic, and disposal of wastewater. (§ 3203.) The Department could reasonably conclude that it would be more efficacious, from a regulatory standpoint, to mitigate such effects directly, by imposing conditions of approval on well drilling permits, rather than indirectly, by imposing conditions of approval on well stimulation permits. (See, e.g., *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 998 [" ' " 'feasibility' under CEQA encompasses 'desirability' to the extent that desirability is

34

based on a reasonable balancing of the relevant economic, environmental, social, and technological factors" ' "].)  That the Center might have chosen another approach does not establish that the Department abused its discretion in concluding that mitigation measures for the indirect effects of well stimulation treatments were infeasible.

6.    *Findings and Mitigation Monitoring and Reporting Plan*

The Center argues the EIR violates CEQA because it fails to make findings or adopt a mitigation monitoring and reporting plan.  The Department responds that neither was required. We agree with the Department.

CEQA requires findings and a mitigation monitoring plan when an agency approves or carries out a project.  (§§ 21081 ["no public agency shall approve or carry out a project for which an environmental impact report has been certified which identifies one or more significant effects on the environment that would occur if the project is approved or carried out unless" the agency makes findings that changes have been required or incorporated into the project to mitigate or avoid such significant effects], 21081.6, subd. (a) [a public agency must adopt a mitigation monitoring program "[w]hen making the findings required by" § 21081]; see also *Christward Ministry v. County of San Diego* (1993) 13 Cal.App.4th 31, 49 ["Nothing in CEQA or the Guidelines requires the mitigation monitoring plan to be in the EIR"].)  As previously discussed, there was no project before the Department before approval, and the Department was not carrying out a program of well stimulation treatments in the State.  Therefore, there was no requirement that the Department make findings or adopt a mitigation monitoring plan in the EIR.

7.    *Field-Specific Analyses*

As previously discussed, the EIR was a programmatic analysis of well stimulation treatments statewide.  However, the EIR also contained a more detailed discussion of the Wilmington, Inglewood, and Sespe fields.  The Center argues these field-specific analyses are legally inadequate and cannot serve as the basis for future environmental

35

review. Specifically, the Center argues the field-specific analyses merely cut and paste the discussion of air quality impacts and mitigation proposals from the statewide analysis, and are consequently the same as, and no more specific than, the analysis of significant impacts and mitigation measures for the state as a whole.[12] We conclude the Center has failed to meet its burden to demonstrate that the EIR is inadequate.

When considering a challenge to the legal adequacy of an EIR, we presume an agency's decision to certify the EIR is correct, placing the burden of establishing otherwise on the party challenging the EIR. (*Sierra Club v. City of Orange, supra,* 163 Cal.App.4th at p. 530; *Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 836 [" ' "Under CEQA, an EIR is presumed adequate [citation], and the plaintiff in a CEQA action has the burden of proving otherwise" ' "].) Here, the Center has established only that the field-specific analysis of air quality impacts and proposed mitigation measures is the same as the statewide analysis of those subjects. The Center has not identified any evidence in the record showing that the air quality impacts of well stimulation treatments at the Wilmington, Inglewood, and Sespe fields are different from the air quality impacts for the state as a whole, or that the proposed mitigation measures for those impacts are or should be different. The Center invites us to assume that the sameness of the analysis establishes a failure of analysis, but we could just as easily assume that the well stimulation treatments at the Wilmington, Inglewood, and Sespe fields are representative of well stimulation treatments statewide. In the absence of an affirmative showing that the EIR's field-specific analyses were inadequate, we must presume that the Department's decision to certify the EIR was correct. (*Sierra Club v. City of Orange, supra,* at p. 530.)

---

[12] This allegation does not appear in the operative petition.

In any event, nothing in the record suggests that the EIR's field-specific analyses will be used to shield future well stimulation treatment projects from further environmental review, as the Center appears to believe. The EIR makes clear that the analysis of the Wilmington, Inglewood, and Sespe fields was conducted on a programmatic basis, in the absence of any specific proposals for well stimulation treatments at those fields, and under considerable time constraints. "As a consequence," the EIR explains, "future applications for well stimulation treatments in these fields will likely require additional evaluation for CEQA clearances, either site-specific Mitigated Negative Declarations or site specific EIR[']s, consistent with State CEQA Guidelines Section 15168, Subdivision (c)(1) [describing future uses of program EIR's]." Although the EIR's field-specific analyses were "intended to facilitate [the Department's] future environmental reviews for the purposes of CEQA compliance," nothing suggests that they were intended to—or did, in fact—displace or supplant any such review.

E. *Request for Declaratory Relief*

Finally, the Center urges us to "issue a declaration that [the Department] may not rely upon, or tier to, or otherwise use this document to satisfy future CEQA obligations." The Center misapprehends our role. We do not consider such requests in the first instance; we review a trial court's ruling on a request for declaratory relief. To the extent the Center asks us to reverse the trial court's ruling, we decline to do so, as the Center fails to demonstrate error.

## III. DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/S/

_____
RENNER, J.


We concur:


/S/

_____
BLEASE, Acting P. J.


/S/

_____
HULL, J.

Filed 6/14/19

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br><br>   Appellant,<br><br>  v.<br><br>CALIFORNIA DEPARTMENT OF CONSERVATION, DIVISION OF OIL, GAS AND GEOTHERMAL RESOURCES et al.,<br><br>   Respondents. | C083913<br><br>(Super. Ct. No. 34201580002149CUWMGDS)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-titled matter filed on May 16, 2019, was not certified for publication in the official reports. For good cause it now appears that the opinion should be published in the official reports and it is so ordered. There is no change in the judgment.

EDITORIAL LISTING

39

APPEAL from a judgment of the Superior Court of Sacramento County, Michael P. Kenny, Judge.  Affirmed.

Center for Biological Diversity, Clare Lakewood, Maya Golden-Krasner, Kassia Siegel; Stanford Law School and Deborah A. Sivas for Appellant.

Xavier Becerra, Attorney General, John A. Saurenman, Assistant Attorney General, Mitchell E. Rishe and Andrew M. Vogel, Deputy Attorneys General, for Respondent California Department of Conservation, Division of Oil, Gas, and Geothermal Resources.

Pillsbury Winthrop Shaw Pittman, Margaret Rosegay, Norman F. Carlin and Blaine I. Green for Respondent Western States Petroleum Association.

BY THE COURT:


/S/

BLEASE, Acting P. J.


/S/

HULL, J.


/S/

RENNER, J.